UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AUTO-OWNERS INSURANCE COMPANY,<br><br>       Plaintiff,<br><br>    v.<br><br>G&D CONSTRUCTION GROUP, INC., and METCON, INC.,<br><br>       Defendants. | CIVIL ACTION NO.<br><br>1:21-CV-0739-SEG |

**O R D E R**

This case is before the Court on Plaintiff's motion for summary judgment. (Doc. 31.) Having carefully reviewed the record, the Court **GRANTS** that motion for the reasons that follow.

**I.    Background**

**A. Overview**

The basic relationships of the parties in this insurance coverage dispute are as follows. Plaintiff Auto-Owners Insurance Company ("Auto-Owners") issued a commercial general liability insurance policy and an umbrella policy to Defendant G&D Construction Group, Inc. ("G&D") for coverage beginning on August 16, 2013. (Doc. 35 ¶ 16; Doc. 1-5; Doc. 1-7.) G&D was hired as a subcontractor to Defendant Metcon, Inc. in relation to the construction of a Spring Hill Suites Hotel in Lumberton, North Carolina, for which Metcon was

hired as general contractor by non-party NP 301, LLC. (Doc. 35 ¶¶ 1-2.) This dispute arises out of allegedly deficient work performed by G&D, which allegedly caused property damage to NP 301's property. Claims brought against Metcon by NP 301 related to this damage have been settled by Metcon. But now Metcon has sued G&D seeking to recover that settlement amount. Auto-Owners seeks a declaratory judgment that it does not owe any insurance coverage obligations to G&D in connection with claims brought by Metcon against G&D, as well as a declaration that it has no duty to defend or indemnify Metcon for the claims brought by NP 301. (Doc. 1 ¶ 1.)

### B. Underlying Disputes

Non-party NP 301, LLC hired Defendant Metcon, Inc. to act as the general contractor for the construction of a hotel. (Doc. 35 ¶ 1.) Subsequently, Metcon retained G&D as a subcontractor responsible for installing the EIFS exterior cladding for the project.[1] (*Id.* ¶ 2.) This was the full scope of G&D's work on the hotel. (*Id.* ¶ 3.) G&D did most or all of the work, but Metcon was later told that G&D had "not properly installed the termination of the EIFS at the base of the first-floor walls around the perimeter" of the hotel. (*Id.* ¶ 4.) Metcon subsequently corrected the allegedly deficient work—it states that

---

[1] EIFS is also known as synthetic stucco. (Doc. 36 ¶ 5.)

G&D abandoned the project in late August 2015 after refusing to correct these deficiencies itself—and eventually the work was accepted by NP 301. (*Id.* ¶ 5; Doc. 36 ¶ 7.) The certificate of occupancy for the hotel was issued on September 30, 2015, and the certificate of substantial completion followed on October 22, 2015. (Doc. 35 ¶ 6.)

The next year, on November 18, 2016, NP 301 informed Metcon that it suspected water intrusion in the hotel. (*Id.* ¶ 7.) In 2020, NP 301 sued Metcon in the Superior Court of Fulton County, Georgia, Civil Action No. 2020-CV-336620 (the "NP 301 Litigation"), asserting claims related to construction work performed on the project, including claims for damages relating to G&D's allegedly improper installation of the EIFS cladding, which was claimed to have resulted in water intrusion that damaged the building. (*Id.* ¶¶ 9-10.) NP 301 made a simultaneous demand for arbitration, and the Underlying Litigation was stayed and submitted to arbitration. (*Id.* ¶ 11; Doc. 36 ¶ 5.) Metcon notified Auto-Owners of the arbitration proceeding on October 30, 2020; Metcon states that it had notified G&D of the proceeding by letter on September 1, 2020. (*Id.* ¶ 12; Doc. 36-16.)

Later, Metcon sued G&D in the Superior Court of Gwinnett County, Georgia, Civil Action No. 21-A-00102-3 (the "Underlying Litigation"). (Doc. 35 ¶ 13.) In that lawsuit, Metcon seeks damages from G&D related to G&D's

3

installation of the EIFS exterior cladding. (*Id.* ¶ 14.) It asserts claims for breach of contract, breach of warranties, negligence, and indemnity. (*Id.*; Doc. 1-2.)

### C. Insurance Policies

Auto-Owners previously insured G&D under two separate policies. As relevant here, it first issued a commercial general liability insurance policy (the "CGL Policy") to G&D for the period of August 16, 2013, to August 16, 2014. (Doc. 35 ¶ 16; Doc. 1-5.) The policy was renewed for another year (Doc. 1-6), but Auto-Owners states that it cancelled coverage on December 16, 2014. (Doc. 35 ¶ 17.) Auto-Owners also issued a commercial umbrella liability insurance policy (the "Umbrella Policy") to G&D for the period of August 16, 2013 to August 16, 2014. (Doc. 1-7.)

When Metcon hired G&D as a subcontractor on the hotel project, G&D's insurance broker provided Metcon with a Certificate of Insurance stating that G&D had commercial general liability insurance. (Doc. 40 ¶ 1.) That Certificate of Insurance identified Metcon as an "additional insured" under G&D's CGL Policy and Umbrella Policy. (Doc. 36-2.) The same document also notes that, in the event Auto-Owners cancelled the policy for non-payment, it would provide ten days' notice to Metcon. (*See id.*) There is a dispute about the significance of this Certificate of Insurance and the significance of Auto-

Owner's possible non-compliance with this notice requirement when it sought to cancel G&D's policy. The Court discusses this at more length below, but ultimately concludes that these issues are immaterial.

### D. Procedural Posture

Auto-Owners filed this suit on February 22, 2021, seeking a declaratory judgment that Auto-Owners has "(i) no duty to cover, indemnify, or defend G&D for the Underlying Lawsuit; and (ii) no duty to defend or indemnify Metcon for the NP 301 Lawsuit, or (iii) no duty to indemnify any judgments or awards made against G&D or Metcon in any civil action[.]" (Doc. 1 ¶ 76(b).)

Metcon has answered and counterclaimed against Auto-Owners. (Doc. 24.) Its counterclaim seeks a declaratory judgment that "Auto-Owners' policies covered the claims asserted against G&D and Metcon[.]" (*Id.* ¶ 25(B).)

G&D has not responded to Auto-Owners' complaint or otherwise appeared in this case. (Doc. 19.) The Clerk entered default against G&D on June 24, 2021.

Auto-Owners now moves for summary judgment against Metcon as to both Auto-Owners' claim and Metcon's counterclaim. Auto-Owners also moves for summary judgment against G&D. G&D is, however, in default, so the Court will consider the motion as a motion for default judgment with respect to G&D. *See, e.g., Carrier v. Jordaan*, 746 F. Supp. 2d 1341, 1345 n.2 (S.D. Ga.

5

2010) (considering a "Motion for Default Judgment and/or Summary Judgment" as to defaulted defendant as a motion for default judgment); *Langsfeld v. Wynne*, No. 1:08-CV-0225-JOF, 2009 WL 383395, at *3 (N.D. Ga. Feb. 12, 2009) (evaluating motion for summary judgment against defaulted defendant under default judgment standard).

## II. Jurisdiction

The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332. There is a complete diversity of citizenship between the parties: Auto-Owners is incorporated and has its principal place of business in Michigan; Metcon is incorporated and has its principal place of business in North Carolina; and G&D is incorporated and has its principal place of business in Georgia. (*See* Doc. 1 ¶¶ 2-4; Doc. 22 at 4-5 & n.3; Doc. 24 ¶ 1.) The amount-in-controversy exceeds $75,000 because Metcon settled NP 301's claims for $975,000, the amount for which it seeks reimbursement in the Underlying Litigation. (*See* Doc. 31-5 ¶ 24.)

## III. Legal Standard

### A. Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

6

judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he Court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute "is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the burden of showing the absence of a genuine issue as to any material fact under Rule 56(c). *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant satisfies that initial burden, it then falls to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), or in other words, to "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Allen*, 121 F.3d at 646. "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny

7

summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). If, however, "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.

### B. Default Judgment

"While 'a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover,' a defaulted defendant is deemed to 'admit[ ] the plaintiff's well-pleaded allegations of fact.'" *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007) (quoting *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). The entry of default against a defendant "do[es] not automatically entitle plaintiffs to a default judgment." *Virgin Records Am., Inc. v. Lacey*, 510 F. Supp. 2d 588, 591 (S.D. Ala. 2007). Instead, "[e]ntry of default judgment is only warranted when there is 'a sufficient basis in the pleadings for the judgment entered.'" *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (quoting *Nishimatsu*, 515 F.2d at 1206).

### IV. Discussion

Auto-Owners argues that several aspects of the CGL and Umbrella Policies independently entitle it to a judgment against both Defendants on the undisputed facts. It contends (1) that the alleged property damage did not take

8

place during the effective policy periods, and that it was not caused by an "occurrence" under the meaning of the policies; (2) that Metcon failed to comply with the policies' notice provisions as a matter of law; and (3) that certain specific policy exclusions, including an exclusion for injuries related to exterior finishing systems like the EIFS cladding at issue here, bar coverage. The Court agrees. Because the Court concludes that there is no record evidence to support a finding that the claimed property damage occurred during the relevant policy period, it has no occasion to reach Auto-Owners' other arguments.

Georgia law governs the insurance contracts.[2] Under Georgia law,

> An insurance policy is simply a contract, the provisions of which should be construed as any other type of contract. Construction of the contract, at the outset, is a question of law for the court. The court undertakes a three-step process in the construction of the contract, the first of which is to determine if the instrument's language is clear and unambiguous. If the language is unambiguous, the court simply enforces the contract according to the terms, and looks to the contract alone for the meaning.

---

[2] As a federal court sitting in diversity, this Court applies the choice of law rules of the forum state. *Federated Rural Elec. Ins. Exch. v. R. D. Moody & Assocs., Inc.*, 468 F.3d 1322, 1325 (11th Cir. 2006). With respect to contracts, Georgia follows the choice of law rule of the *lex loci contractus. Gen. Tel. Co. of S.E. v. Trimm*, 311 S.E.2d 460, 462 (Ga. 1984). The relevant policies were both delivered in Georgia (*see* Doc. 1 ¶ 5; Doc. 24 ¶ 5), so Georgia law governs them. *See Trimm,* 311 S.E.2d at 462 ("The last act essential to the completion of the contract having occurred in this state, Georgia law applies."); *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir. 1998) ("Under Georgia law, an insurance contract is 'made' where it is delivered.").

9

*Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co., Inc.*, 707 S.E.2d 369, 371 (Ga. 2011) (citations omitted). At the same time, "[a]ny ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 498 S.E.2d 492, 494 (Ga. 1998).

As relevant here, both the CGL Policies and the Umbrella Policy provide coverage for "property damage" "only if" that property damage "is caused by an 'occurrence'" and the "'property damage' occurs during the policy period[.]" (Doc. 1-5 at 18-19; Doc. 1-6 at 18-19; Doc. 1-7 at 13-14.) An "occurrence" is defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 1-5 at 36; Doc. 1-6 at 36.) "Property damage is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured[.]" (Doc. 1-5 at 37; Doc. 1-6 at 37.)

Auto-Owners argues that there is no evidence that the relevant property damage occurred during the policy period and that because the alleged cause of the damage was intentional rather than accidental, it cannot qualify as an

"occurrence" under the policies. In support of both conclusions it relies heavily on *Owners Ins. Co. v. James*, 295 F. Supp. 2d 1354 (N.D. Ga. 2003), a case involving highly similar facts and a nearly identical insurance policy.[3]

One aspect of that case, and one of Auto-Owners' arguments, can be dealt with at the outset. *James* does indeed support Auto-Owners' position that the defective construction work at issue here cannot be "an occurrence" under the meaning of the policy. *See id.* at 1363-64. But that holding is no longer good law, and Auto-Owners' "occurrence" argument is unavailing. Eight years after *James* was decided, the Supreme Court of Georgia—interpreting a standard CGL insurance contract defining "occurrence" the same way as the policies here—held that "an occurrence can arise where faulty workmanship causes unforeseen or unexpected damage to other property." *Am. Empire*, 707 S.E.2d at 372. In doing so, it "reject[ed] out of hand the assertion that the acts of [a subcontractor] could not be deemed an occurrence or accident under the CGL

---

[3] The policy language at issue in *James* is quoted in this excerpt:
> The insurance policies provide that the plaintiff will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The policies further indicate that "[t]his insurance applies to 'bodily injury' and 'property damage' only if ... [t]he 'bodily injury' or 'property damage' occurs during the policy period."

*James*, 295 F. Supp. 2d at 1362 (citations omitted).

policy because they were performed intentionally." *Id.* That case bars Auto-Owners' "occurrence" argument. *See also Taylor Morrison Services, Inc. v. HDI-Gerling Am. Ins. Co.*, 746 S.E.2d 587, 591 (Ga. 2013) (discussing *Am. Empire* and further holding "that an 'occurrence,' as the term is used in a standard CGL policy, does not require damage to the property or work of someone other than the insured").

But *James*' holding regarding the timing of the relevant property damage is still good law, and the case is instructive on that point. *See Taylor Morrison*, 746 S.E.2d at 589. *James* observed that, "[b]ased on the plain language of the policies, the relevant question in determining coverage is when the property damage occurred, rather than when the event causing that damage occurred." *James*, 295 F. Supp. 2d at 1362; *see Columbia Cas. Co. v. Plantation Pipe Line Co.*, 790 S.E.2d 645, 649-50 (Ga. Ct. App. 2016). "Thus, the appropriate question in this case is not when the EIFS was applied, but rather when the homeowners allegedly sustained property damage caused by the application of the EIFS." *James*, 295 F. Supp. 2d at 1362. At any rate, this much is evident from the plain language of the policies themselves. (*See* Doc. 1-5 at 18-19; Doc. 1-6 at 18-19; Doc. 1-7 at 13-14.)

Auto-Owners, like the plaintiff in *James*, argues that any such property damage could not have occurred prior to September 30, 2015, when a certificate

12

of occupancy was issued for the building, and it was not until November 18, 2016 that NP 301 informed Metcon of suspected water damage. Because the CGL Policies were cancelled as of December 16, 2014 (and the Umbrella Policy was cancelled earlier), the Court must consider whether there is record evidence of property damage dating to the policy period. Metcon contends that there is a genuine dispute as to whether there was property damage caused by G&D's work prior to December 16, 2014.[4] It points to two pieces of record evidence: the affidavit of Mark Floyd, Metcon's Vice President and the Senior Project Manager for the hotel project at issue here, and the report of a forensic engineering firm hired by NP 301 to evaluate the extent and causes of the water intrusion in its facility. (Doc. 34 at 8) (citing Doc. 36 ¶13; Doc. 36-10; Doc. 36-11; Doc. 36-12; Doc. 36-13). On the basis of this evidence, Metcon argues that "[a] portion of the defective work identified in the Intertek PSI report was in place prior to December 16, 2014, and this defective work exposed the OSB sheathing and wooden framing to water damage that grew worse over time." (Doc. 34 at 7-8.) Metcon also contests the date at which the policy period ended, arguing that because Auto-Owners failed to provide it with a "10-day

---

[4] Metcon also argues that there is evidence that G&D performed defective work during the policy period, but any such evidence is immaterial, for the question is when property damage occurred, not when the actions causing the damage took place. *See James*, 295 F. Supp. 2d at 1362.

13

Notice for Non-Pay Cancellation," there is "an issue of fact as to the effect of the . . . failure to provide the notice prior to the cancellation of the liability policy." (Doc. 34 at 8.)

The trouble for Metcon is that its evidence, while sufficient to create an issue of whether G&D's work was the "occurrence" that caused the alleged property damage, provides little to no basis for determining when the alleged "property damage" took place. *See Taylor Morrison*, 746 S.E.2d at 591; *James*, 295 F. Supp. 2d at 1362. The cited portion of the Floyd Declaration merely discusses the contents of the forensic engineering firm's report. (Doc. 36 ¶ 13.) The forensic engineering firm's report, which was issued on February 5, 2019, and draws on site investigations in late 2018, discusses various possible causes of the "bulk moisture intrusion" in the building. (Doc. 36-10 at 1-5.) It identifies "numerous deficiencies associated with the installation of the EIFS system." (*Id.* at 2.) But it has nothing to say about when the moisture intrusion began. The only evidence of that damage dates from, at the earliest, November 18, 2016, when NP 301's representative wrote to Metcon regarding water leaks and other water-related damage. (Doc. 31-8.) That letter, in turn, suggests that NP 301 may have noticed water damage in September 2016, but it otherwise is silent about when the damage first occurred. There is no evidence of earlier property damage.

14

It is in theory possible that the moisture intrusion began earlier, but nothing in the record could authorize a factfinder to reach that conclusion—let alone the conclusion that it began before a specific date—by a preponderance of the evidence. All one would have to go on is the timing of G&D's work, which began "in the first quarter of 2014 and continued . . . through August 2015," and pure speculation as to when moisture intrusion might have followed. (Doc. 36 ¶ 7.) Casting the facts in the light most favorable to the non-movant, it seems reasonable to assume that at least some of the defective work occurred before December 16, 2014, when Auto-Owners says it cancelled the policy. But it is impossible to tell which work was done then, whether that work caused almost immediate property damage, and indeed what "property damage" would mean in the context of a building still under construction.[5] There are, for example, no indications of how moisture intrusion from an EIFS installation that was defective in the relevant ways could be expected to progress: whether damage would begin at the moment of installation, after a

---

[5] Metcon asserts that "[a] portion of the defective work identified in the Intertek PSI report was in place prior to December 16, 2014[.]" (Doc. 34 at 7.) But its citations to the record say only that the EIFS installation was defective in many ways; they do not say when the defective work was done. (*See* Doc. 36; Doc. 36-10; Doc. 36-11; Doc. 36-12; Doc. 36-13.)

serious storm—the record speaks of damage from Hurricane Matthew (Doc. 31-8), which occurred in early October 2016—or in some other manner.[6]

In *James*, the mere fact that the defective EIFS cladding was in place was, without more, held not to be enough to create an issue of fact as to the occurrence of property damage. *See James*, 295 F. Supp. 2d at 1362 ("[E]ven if the homeowners could establish that the EIFS system was installed during March and April of 1995, there is no evidence showing that any damage occurred in the one- to two-month window between that application and June 1, 1995. Accordingly, the court concludes that the plaintiff has no duty to defend or indemnify Precision in the underlying suit.") The same result is due here. A factfinder could only speculate about the time when the water damage began, and "speculation does not create a genuine issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). Indeed, to reach a contrary result would be, in essence, to allow the "occurrence" and the

---

[6] With respect to the hurricane, see National Weather Service, Hurricane Matthew in the Carolinas: October 8, 2016 (Sept. 29, 2017), *available at* https://www.weather.gov/ilm/Matthew. The Court takes judicial notice of the approximate date of the hurricane, as it is a fact not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see, e.g.*, *Izquierdo v. Certain Underwriters at Lloyd's London*, No. 19-61910-CIV, 2022 WL 10592800, at *2 & n.2 (S.D. Fla. Oct. 18, 2022) (taking "judicial notice of the fact that Hurricane Irma struck southeast Florida on or about September 10, 2017" and citing to an equivalent National Weather Service report).

"property damage" to merge: property damage would be immediately inferred from there mere presence of the defective EIFS system. But that result would contravene the Supreme Court of Georgia's clear injunctions to keep the requirements separate in interpreting standard CGL policies: "Remember that an 'occurrence' alone is not enough to give rise to coverage under a standard CGL policy. The 'occurrence' also must cause 'bodily injury' or 'property damage,' and the insured must incur a liability to pay 'damages because of [such] 'bodily injury' or 'property damage.'" *Taylor Morrison*, 746 S.E.2d at 591; *see also id.* at 591 n.10.

Nor, finally, does Metcon's argument about the lack of notice of cancellation compel any different conclusion. Even if its argument were accepted and the CGL Policy had remained effective until it expired by its terms on August 16, 2015 (Doc. 1-6 at 1), the policy period would still end more than a year before the first evidence of property damage, and indeed before G&D had even completed its work on the EIFS cladding. (*See* Doc. 36 ¶ 7) (stating that "G&D abandoned the Project on or about August 25, 2015"). If the later date is used, it allows one to infer that most of G&D's allegedly defective work was complete when the policy period ended. But it remains the case that there is no evidence of any property damage for at least another year.

17

Thus, because Metcon has failed to "come forward with specific facts showing that there is a genuine issue for trial," *Matsushita*, 475 U.S. at 587 (quotation marks omitted), Auto-Owners is entitled to summary judgment against Metcon on its own claim and on Metcon's counterclaim.

The same conclusion is due with respect to Auto-Owners' claim against G&D, which is in default. The same considerations, rooted in the language of the CGL and Umbrella Policies, apply to Auto-Owners' coverage obligations with respect to G&D as apply to Metcon. It is enough for the claims against both Defendants that the record does not contain evidence that the property damage took place during the policy period. Thus, the Court concludes that there is a "sufficient basis in the pleadings for [default] judgment to be entered" against G&D. *Nishimatsu*, 515 F.2d at 1206.

## V.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment (Doc. 31) is **GRANTED**. Auto-Owners has no duty to cover, defend, or indemnify G&D for the claims brought against it in Civil Action No. 21-A-00102-3 in the Superior Court of Gwinnett County, Georgia. Nor does it have a duty to defend or indemnify Metcon for the claims brought against it in Civil Action No. 2020-CV-336620 in the Superior Court of Fulton County, Georgia.

The Clerk is **DIRECTED** to terminate this case.

**SO ORDERED** this 10th day of March, 2023.

_____
SARAH E. GERAGHTY
United States District Judge